IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

BRYAN McGEHRIN, # 360-634        \*

    Plaintiff                                        \*

        v                                            \*         Civil Action Case No. DKC-11-818

PETER STANFORD, et al.              \*

    Defendants                                 \*
                                                 \*\*\*

## MEMORANDUM OPINION

Pending is Brian McGehrin's ("McGehrin") prisoner civil rights complaint pursuant to 42 U.S.C. § 1983. Motions to Dismiss or in the Alternative for Summary Judgment have been filed by counsel on behalf of Kathleen Green[1] (ECF No. 10) and Peter Stanford, PAC and Jessica Cecil, PAC (collectively the "Medical Defendants") ECF No. 14. [2] McGehrin has filed an opposition to Defendants' dispositive motions. ECF No. 21. The case is ripe for disposition, and the court now rules pursuant to Local Rule 105.6 (D. Md. 2011). For reasons to follow, the Court will grant Kathleen Green's motion for summary judgment and deny the Medical Defendants' Motion for Summary Judgment.

I.     BACKGROUND

McGehrin, an inmate at Eastern Correctional Institution ("ECI"), suffers chronic pain in his left wrist from a work-related injury in 2007. He claims that Defendants failed to renew his

---

[1] Kathleen Green is the Warden of ECI.

[2] Service has not been obtained on David Mathis, M.D. Court personnel have confirmed that Dr. Mathis is no longer employed by Corizon, (formerly Correctional Medical Services), the medical contractor at Eastern Correctional Institution.

prescription of Ultram or tramadol[3] 100 mg, the only pain medication and dosage that he has found effective, and for approximately 2 and 1/2 months failed to prescribe a substitute medication, despite his submission of numerous sick call slips complaining of increased pain and resulting side effects. Complaint, ¶¶ 2, 3, 6, 10; McGehrin Affidavit, ¶ 2 At the time he filed this Complaint, McGehrin claimed that he had suffered needlessly for 194 days (Complaint, ¶ 16) because his chronic pain has been so extreme that he is unable to eat, sleep, or participate in out-of-cell activities. Complaint, ¶ 5, Plaintiff's Opposition, p. 5; McGehrin affidavit, ¶ 5. McGehrin asserts that he lost over ten pounds "since removal of adequate pain medication" because "unbearable" pain left him unable to eat. McGehrin Affidavit, ¶ 5.

Further, McGehrin asserts that Defendants have failed to provide him with any "rational basis" for taking him off tramadol. Plaintiff's Opposition, p. 6. He avers that when Defendants later prescribed substitutes for tramadol, the medications proved ineffective in relieving his pain and caused contraindications. *See id*. pp. 2 and 8; McGehrin Affidavit, pp 2-3. McGehrin claims Stanford's decision "[t]o take away his pain medication and refuse to provide any substitute" shows deliberate indifference to his serious medical needs. *See id*. He asserts that Defendant Stanford "forgot to order meds after promising to order it [sic], and misled Plaintiff about pain management options." *Id*. p. 6. He faults Stanford for visiting his housing unit a total of 8 times to make sick-calls to other inmates, but without following up on McGehrin's complaints of pain. *See id*. ¶ 10. He claims the Medical Defendants failed to respond to his sick call slips, failed to schedule promised medical appointments, and promised to order medication

---

[3] Tramadol is a generic of Ultram. Medical Defendants' Memorandum, p. 8, n. 1; *See also* http://www.pdr.net/drugpages/concisemonograph. Medical Defendants refer to the medication by its brand name Ultram.

that he never received. Complaint, ¶¶ 6, McGehrin Affidavit, ¶¶ 4, 5, 7, McGehrin Affidavit, ¶¶

As relief, McGehrin wants compensatory and punitive damages and injunctive relief.

## II.   FACTS

It is undisputed that McGehrin has a history of a left wrist fracture which was surgically repaired approximately two years ago. Exhibits show the following sequence of events relevant to the issues presented.

On April 23, 2010, Bruce Ford ("Ford"), a physician's assistant, prescribed Naprosyn, a non-steroidal anti-inflammatory medication ("NSAID") for McGehrin's wrist pain. McGehrin stated that Naprosyn did not relieve his pain and requested tramadol, a "narcotic-like" [4] analgesic instead. Stanford Affidavit, Medical Def.Exhibit A, ¶ 3. *See id*, ¶4. On May 14, 2010, McGehrin told Ford the Naprosyn failed to alleviate his pain. He requested Ultram. Ford advised that if he prescribed Ultram, McGehrin's activities would be restricted, including no use of the recreation yard or gym. McGehrin agreed to the restrictions and Ford prescribed Ultram 50 mg. twice daily and continued the Naprosyn. *See id*, ¶ 5.

On June 26, 2010, the Ultram prescription at 50 mg twice daily was renewed for one month. McGehrin continued to complain of pain. On August 25, 2010, Ford advised McGehrin that his Ultram dosage would be decreased by one half and he would instead receive Elavil (amitriptyline), an anti-depressant medication used to treat chronic pain. McGehrin agreed and told Ford that he usually did not take his morning dosage of Ultram anyway. Ford prescribed Ultram 50 mg. and Elavil 25 mg. to be taken at bedtime with the intention of eventually stopping the Ultram. Medical Def. Exhibit B, pp. 15-17, 69.

---

[4]   McGehrin indicates he took Ultram as a "watch take" medication in front of prison staff. Plaintiff Opposition Response, p. 3.

3

McGehrin disputes the Medical Defendants' version of the medical visit.  Specifically, he denies telling Ford that he wasn't taking his morning dose of Ultram.  Plaintiff's Opposition, p. 3.  He states that he said his pain was worse at night and that is why he wanted to take both doses of Ultram at night.  *See id*, p. 2; McGehrin Affidavit, ¶ 2.  According to McGehrin:

> P.A. Ford then suggested I take one 50 mg. dose of tramadol and one 25 mg. dose of amitriptyline at night, for he was interested in seeing the results.  Never once did he say anything about gradually decreasing tramadol nor did I agree to that.  Bruce Ford told me that if the change did not work, then we would implement 100 mg. tramadol at bedtime.  Never would I have agreed to removing the only medication presenting relief.

*See id.*

On September 21, 2010, McGehrin told Stanford that the amitriptyline did nothing to help his pain.  McGehrin again asked for Ultram at night.  Stanford discontinued the Ultram and discussed adding Neurontin, a seizure medication used for certain kinds of pain relief.  *See id*, pp. 18-19, 70-71.  McGehrin states that he told Stanford his pain levels were increasing substantially and the Amitriptyline was making him dizzy, drowsy, and light-headed.  McGehrin Affidavit, ¶ 3.

On September 25, 2010, the Ultram prescription ended.  *See id.*  McGehrin's only pain medication at that point was amitriptyline, which had side effects and provided him with ineffective pain relief.  *See id.*

In October of 2010, McGehrin filed two unanswered sick call slips and an Administrative Remedy Procedure (ARP) request.  He claims the ARP investigator, Ms. Nancy Bealer, told him that he was "a prime candidate for the medication tramadol and should not have been taken off."  McGehrin Affidavit, ¶ 4.  He faults Defendant, Warden Kathleen Green for dismissing his ARP request on December 2, 2010 "with a completely erroneous response."

4

Complaint, ¶ 9.

On October 30, 2010, McGehrin submitted a sick call request, complaining that his medication had been stopped and he needed it renewed. Stanford evaluated McGehrin on November 4, 2010. McGehrin reiterated that the amitriptyline provided him no pain relief. Stanford prescribed Ultram 50 mg. at bedtime and reminded McGehrin that that he was subject to restrictions on his activity while on the medication. Before the prescription was filled, however, Asresahegn Getachew, M.D., the Associate State Medical Director, suggested that before placing McGehrin on long-term narcotics, there should be consultations with staff physician Paul Matera, M.D., the on-site psychiatrist, and the pharmacist.[5] Dr. Getachew suggested prescribing Neurontin and amitriptyline. Stanford advised McGehrin in writing that the Ultram prescription had not been approved and a follow-up appointment would be scheduled. Thirty-five days elapsed before McGehrin was seen for the follow-up appointment.

On December 9, 2010, McGehrin saw Stanford for the follow-up visit at which he complained of left wrist pain radiating to his forearm. Physical examination of the left wrist revealed tenderness upon palpation over the end of the radius, normal range of motion of the wrist and fingers, normal reflexes, and normal strength. McGehrin told Stanford that in the past he had taken oxycodone (OxyContin), hydromorphone, morphine, amitriptyline, Ultram, and Naprosyn with varying degrees of relief. McGehrin noted that he got the most relief with Oxycontin. Further, McGehrin expressed disappointment that the Ultram had not been approved but stated he was willing to try the Neurontin and amitriptyline combination. Stanford prescribed Neurontin 300 mg. at bedtime and increased the amitriptyline to 50 mg. at bedtime,

---

[5]  There is nothing in the record showing whether the consultations took place.

with the intention of increasing the Neurontin dosage by 300 mg. each week as needed for pain relief.  Exhibit B, pp. 25-26, 73.

On January 2, 2011, McGehrin submitted a sick call request form in which he stated his medications were ineffective.  On January 18, 2011, Stanford examined McGehrin and found no change in his left wrist.  He ordered an x-ray of the wrist and increased the Neurontin to 300 mg. twice a day.  The x-ray showed no fracture or other acute disease.  The hardware in the radius bone, a large bone in the forearm that extends from the right side of the elbow to the thumb side of the wrist, was intact and stable. Exhibit A, p. 4 ¶ 2; Exhibit B, pp. 27-31, 74-76. McGehrin reported his pain at eight on a one to ten scale and stated he was losing weight.  He states that Stanford "promised to submit non-formulary paper work for tramadol and 'see what happens.'" McGehrin Affidavit. ¶ 6

On February 2, 2011,  McGehrin filed another sick call request complaining of increased pain as the Neurontin did nothing for his pain.  McGehrin Affidavit, ¶ 7.

On February 8, 2011, McGehrin was seen by Stanford, who "promised to submit paper work again, telling me it got denied again on January 2, visit." *See id*.  McGehrin states that on February 14, 2011, the evening pill distribution nurse "Theresa" said that Stanford had forgotten to order all patient medications from February 8 visits. *See id.*

On February 15, 2011, McGehrin filed another sick call slip. *See id*.  He was seen by Stanford that evening.  According to McGehrin, Stanford admitted that he had been "lying" about submitting a non-formulary request for tramadol, he apologized, and submitted the paper work in McGehrin's presence.  *See id.*

6

By letter dated February 18, 2011, Stanford notified McGehrin that: he had re-submitted a Non-Formulary Drug Request Form ("NFDRF") for Ultram; requested a neurology consultation; directed McGehrin to take Neurontin while awaiting a decision on the Ultram; and if McGehrin wanted to try increasing the dosage of Neurontin, he should submit a Sick Call Request Form. Exhibit A, p. 12. McGehrin states the Ultram was approved by Dr. Getachew. The prescription was for 50 mg. at bedtime. McGehrin attests that he "finally experienced some relieve [sic] again to this unbearable pain." McGehrin Affidavit, p. 8.

On February 25, 2011, McGehrin was moved to a different housing unit. As a result, his care was transferred to Jessica Cecil, a physician's assistant.

On February 28, 2011, McGehrin submitted a Sick Call Request Form, complaining that although he was again taking Ultram, the dosage was not strong enough to be effective. He stated that only at 100 mg. did his pain become bearable.

On March 7, 2011, Jessica Cecil ("Cecil") told McGehrin the staff needed to add Motrin to his medication schedule before increasing the Ultram. McGehrin asked for a pain management referral to which Cecil replied that there were still medical regimens that could be tried and a referral was not yet warranted. Because McGehrin had stated the Neurontin did not alleviate his pain, Cecil did not renew the Neurontin prescription. She advised him to avoid heavy lifting, sports or work and referred him to the Pain Management Chronic Care Clinic ("CCC"). Exhibit A, ¶ 13.

McGehrin's description of the medical visit is that after he described his pain as a "7-8," Cecil accused him of lying and refused to treat him. McGehrin Affidavit, ¶ 8. Cecil "said I would have to be seen by Dr. Quilo and chronic care since I couldn't tell her the truth." *Id.*

When Cecil gave him Motrin, he told her that Motrin did not help and upset his stomach. *See id.*

On March 13, 2011, McGehrin submitted a Sick Call Request Form, requesting renewal of his March 18, 2011 Neurontin prescription. He was seen by Cecil on March 16, 2011, at which time he rated his pain as an eight on a one to ten scale. She noted that McGehrin was sitting in the clinic calmly and did not appear to be in distress. She renewed the prescription and noted on his medical record that he would be followed in the CCC for pain management. Exhibit A, ¶ 14.

On March 28, 2011, McGehrin submitted a Sick Call Request Form to the CCC for his pain. He was scheduled for an appointment on April 11, 2011, but did not appear for the appointment.

On April 14, 2011, [6] Lino Quilo, M.D. examined McGehrin. Dr. Quilo informed McGehrin that Ultram was not indicated for chronic pain management. McGehrin agreed to increase his dosage of Neurontin to 600 mg. twice daily. Additionally, Dr. Quilo noted that he would request an orthopedic consultation because McGehrin said he was supposed to have had orthopedic hardware removed from his wrist prior to his incarceration. Exhibit A, ¶ 15. The consultation request was denied by Wexford Health Service, the utilization review contractor for the State of Maryland. Dr. Quilo resubmitted the consultation request on June 6, 2011.[7] *See id.*

McGehrin states that Dr.Quilo told him that he would not renew Ultram for chronic pain. McGehrin told him that Dr. Getachew had approved tramadol for his chronic pain. Dr. Quilo

---

[6] McGehrin says he was seen by Dr. Quilo on April 10, 2011. McGehrin Affidavit, ¶ 10.

[7] Counsel for the Medical Defendants explains that Wexford reviews and approves all requests by on-site and off-site consultants for certain medical devices and tests. When on-site or off-site consultants request or recommend certain medical treatment, Wexford's utilization review panel must give final approval. Defendants are not affiliated with Wexford nor have any control over the Wexford approval process. Medical Defendants' memorandum, p. 12, n. 3. Currently, Wexford is not a defendant in this action.

increased "an already ineffective Neurontin to 1200 mg." and promised to schedule McGehrin for an off-site orthopedic consultation before May 18, 2011. McGehrin Affidavit, ¶ 10.

On May 5, 2011 and May 11, 2011, McGehrin filed sick call requests asking when he would see an orthopedist. McGehrin was told that the off-site consultation was "on hold until [McGehrin] was given a functional assessment." McGehrin Affidavit, ¶ 11.

On May 21, 2011, the tramadol was stopped. McGehrin state he suffered "brutal pain once again. I was able to eat regularly while back on tramadol and records will show that I was gaining weight back. Now I was once again unable to eat sleep and exercise." *Id*.

On May 27, 2011, Dr. Inzerrillo examined McGehrin. McGehrin states that Dr. Inzerrillo promised to renew the tramadol prescription. McGehrin states, "[u]nbeknownst to me, Dr. Inzerillo was supposed to complete the functional assessment needed for further treatment. He did not complete the functional assessment. Once my medication did not change, I put another sick call in on 5/30/11." *Id*.

On June 6, 2011, Dr. Quilo examined McGehrin's left wrist. Physical examination revealed no limitation of function and good circulation. Dr. Quilo prescribed Pamelor, an anti-depressant that is also used for the treatment of chronic pain. Jennifer Castanare, R. N. observed McGehrin writing during the medical visit with his left hand. She saw no impairment of his left hand while he was writing. Medical Def. Exhibit A, ¶ 16.

On June 17, 2011, McGehrin filed a sick call slip for chronic pain and complaining about the side effects of Pamelor. He indicated that he was suffering from diarrhea, excessive urination, drowsiness, and dizziness. The sick call slip went unanswered. McGehrin Affidavit, ¶ 12. On July 5, 2011, McGehrin filed a second sick call slip presenting the same concerns.

### III. STANDARD OF REVIEW

> Under Fed.R.Civ.P. 56(a):
>
> A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

Summary judgment is appropriate when there is no genuine issue as to any material fact, and the moving party is plainly entitled to judgment in its favor as a matter of law. In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249(1986) the Supreme Court explained that in considering a motion for summary judgment, the "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Id*. at 252.

The moving party bears the burden of showing that there is no genuine issue as to any material fact. No genuine issue of material fact exists if the nonmoving party fails to make a sufficient showing on an essential element of his or her case as to which he or she would have the burden of proof. *See Celotex Corporation v. Catrett*, 477 U.S. 317, 322–23 (1986). Therefore, on those issues on which the nonmoving party has the burden of proof, it is his or her responsibility to confront the summary judgment motion with an affidavit or other similar evidence showing that there is a genuine issue for trial.

In undertaking this inquiry, a court must view the facts and the reasonable inferences drawn therefrom "in a light most favorable to the party opposing the motion." *Matsushita Electric Industrial. Co. Ltd. v. Zenith Radio Corporation*, 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc*., 369 U.S. 654(1962)). The mere existence of a "scintilla" of evidence in support of the non-moving party's case is not sufficient to preclude an order granting summary judgment. *See Anderson*, 477 U.S. at 252.

This court has held that a "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala*, 166 F.Supp.2d 373, 375 (D.Md.2001) (citation omitted). Indeed, the court has an affirmative obligation to prevent factually unsupported claims and defenses from going to trial. *See Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir.1993) (quoting *Felty v. Graves–Humpreys Co*., 818 F.2d 1126, 1128 (4th Cir.1987)).

**IV.   DISCUSSION**

The government is "obligat[ed] to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 102 (1976). When prison officials show "deliberate indifference" to a prisoner's "serious medical needs," their actions or omissions give rise to an Eighth Amendment violation. *Id.* at 104. The prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). The medical treatment provided must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness. *See Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990). Thus, a health care provider must have actual knowledge of a serious condition,

not just knowledge of the symptoms. *See Johnson v. Quinones*, 145 F.3d 164, 168 (4th Cir. 1998). Mere negligence or malpractice does not rise to a constitutional level. *Miltier,* 896 F.2d at 848. An inmate's disagreement with medical providers about the proper course of treatment does not support an Eighth Amendment cause of action. *See Wright v. Collins,* 766 F.2d 841, 849 (4th Cir. 1985); *Wester v. Jones*, 554 F.2d 1285 (4th Cir. 1977); *Russell v. Sheffer*, 528 F.2d 318 (4th Cir. 1975).

Prison officials cannot be held liable for actions or failures to act on the part of the medical staff nor can they be held liable for relying on the professional medical judgment of health care providers employed by the prison to care for inmates. *See Vinnedge v. Gibbs*, 550 F.2d at 928 (4th Cir. 1977); *see also Carter v. Morris*, 164 F.3d 215, 220-21 (4th Cir. 1999). Supervisory prison officials can only be liable where it is shown they failed to timely provide needed care, deliberately interfered with doctors' performance, or tacitly authorized or were deliberately indifferent to prison physicians' constitutional violations. *See Miltier*, 896 F.2d at 854-55.

### A. Claims Warden Kathleen Green

McGehrin faults Warden Kathleen Green for dismissing his ARP request on December 2, 2010 "with a completely erroneous response. Complaint, ¶ 9. The Warden's Office investigated the allegations in his ARP request and responded with the information provided by the investigator who had reviewed McGehrin's medical records. Warden Green, Exhibit B, Declaration of James Balderson.

Inmate medical care is provided by Correctional Medical Services, Inc. (now Corizon, Inc.), a private medical contractor with the State of Maryland. *See* Green Exhibit A, Declaration

12

of Assistant Warden Ronald Dryden, ¶ 2. Warden Green is not authorized to direct CMS employees what medical treatment to provide. *See id*. There is no allegation that she deliberately interfered with medical providers or tacitly authorized or was deliberately indifferent to alleged constitutional violations by medical providers. In sum, Warden Green is entitled to rely on the professional medical judgment of prison health care providers. *See Vinnedge v. Gibbs*, 550 F. 2d at 928. Summary judgment in her favor is granted.

### B. Claims Against the Medical Defendants

The Medical Defendants aver that they properly assessed and treated McGehrin for his wrist pain. They assert that medical personnel repeatedly evaluated McGehrin and provided treatment for his medical concerns.

The Medical Defendants do not dispute McGehrin's claims of severe, chronic wrist pain nor the resultant inability to eat, sleep, or exercise when taken off Ultram. They take no issue with his claims of weight loss caused by inability to eat due to pain. Further, is unclear why the decision was made to stop the Ultram, especially given actions by several different medical providers to subsequently renew the prescription and the ineffectiveness of alternative courses of medication to alleviate McGehrin's pain.[8] Viewing the facts and the reasonable inferences in favor of McGehrin, the record shows that McGehrin repeatedly alerted medical providers in person and in writing that Ultram has been the only effective medication for his pain. He was taken off Ultram in order to try a new regimen of medications. Between September 25, 2010,

---

[8] Tramadol is described by counsel for the Medical Defendants as "narcotic-like. "*Supra*, p. 3. No suggestion of abuse is raised here. As earlier noted, tramadol is administered on a "watch-take" basis. *See id*, n. 3. McGehrin indicates that tramadol is a non-forumulary medication and it is unclear if this had a role in the determination to take him off the medication. ECF No. 21, McGehrin affidavit, ¶ 6. Defendants' general observations that McGehrin sat quietly waiting for his medical appointment and appeared to write with this left hand without difficulty are insufficient for summary judgment.

when his Ultram prescription finished and December 9, 2010, Defendant Stanford failed to prescribe a substitute medication for Ultram, despite McGehrin's submission of numerous sick call slips during this time in which he complained of increasing pain. *See id.* McGehrin's only pain medication during this period was amitriptyline, which he had already reported to Sandford had side effects and provided ineffective pain relief. There is no dispute that McGehrin suffered severe pain, insomnia, inability to eat, weight loss, and inability to exercise during this period. Under these circumstances, genuine issues of material fact exist as to whether the Medical Defendants' actions are sufficient to show deliberate indifference to McGehrin's serious medical needs so that summary judgment is not appropriate. Accordingly, the court will deny the Medical Defendants' motion for summary judgment.

### V. CONCLUSION

For these reasons, the court will grant summary judgment in favor of Warden Kathleen Green. The Medical Defendants' Motion for Summary Judgment will be denied. Further, the court will grant McGehrin twenty-eight days to file a motion for appointment of counsel. A separate Order follows.


Date:   January 19, 2012             /s/
                                     DEBORAH K. CHASANOW
                                     United States District Judge